COMMISSIONER OF INTERNAL REVE-
NUE v. GREAT AMERICAN LIFE
INS. CO.
No. 894.

Circuit Court of Appeals, Tenth Circuit.
March 26, 1934.

Rehearing Denied April 30, 1934.

Francis H. Horan, Sp. Asst. to Atty. Gen. (Pat Malloy, Asst. Atty. Gen., J. Louis Monarch, Sp. Asst. to Atty. Gen., and E. Barrett Prettyman, Gen. Counsel, Bureau of Internal Revenue, and Lloyd W. Creason, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for petitioner.

Warren H. White, of Rock Rapids, Iowa (A. C. Malloy and Roy C. Davis, both of Hutchinson, Kan., on the brief), for respondent.

Thomas Watters, Jr., and Maxwell A. O'Brien, both of Des Moines, Iowa, amici curiæ.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

Section 203 (a) (2) of the Revenue Act of 1928 (45 Stat. 791, 843, 26 USCA § 2203 (a) (2) provides that life insurance companies may deduct from their gross income "4 per centum of the mean of the reserve funds required by law." Treasury Department Regulation 74, Art. 971, provides that:

"The reserve deduction is based upon the reserves required by express statutory provisions or by the rules and regulations of the State Insurance departments when promulgated in the exercise of a power conferred by statute; but such reserves do not include

assets required to be held for the ordinary running expenses of the business."

The respondent, a life insurance company organized under the laws of Kansas, issued, during 1929, "guaranteed premium reduction policies," to which are attached coupons which mature each year during the term of the policy. A specimen coupon reads:

"On or at any time after Sept. 1, 1921 No. 1

"The Great American Life Insurance Co. of Hutchinson, Kansas, will pay, credit or apply on account of Policy No. Specimen according to the terms of the same provided all premiums due on said policy to and including said date shall have been paid

"Fifty-seven and 50/100 Dollars $57.50."

Although the insured is entitled to cash a coupon upon maturity, he is not required to do so, the policy giving him these options: (a) to use the coupon to reduce the premium due at the time the coupon matures; (b) to leave the coupon with the respondent, to be withdrawn by the policyholder, in whole or part, at any time with 3½ per cent. interest; (c) to use it for the purchase of additional paid-up nonparticipating insurance; (d) if the coupons are left for fifteen years, they may be used to mature a twenty-year paid-up policy at the end of fifteen years; (e) if the coupons are left for thirty-one years, the policy matures as an endowment at the end of that period.

It is stipulated that the respondent set up on its books a reserve fund to cover its liability on said coupons. Section 40—404, R. S. Kan., 1930 Supp., requires life insurance companies to deposit with the State Treasurer "an amount equal to the net reserve of all policies and annuity bonds in force in such company, the amount thereof to be determined by a valuation made in accordance with the provisions of this code."

Section 40—353, R. S. Kan., 1923, requires every life insurance company to set aside and hold intact "a legal reserve fund, which shall be equal to the amount of the net present value of all policies in force valued by the American experience table of mortality with three and one-half per cent interest."[1]

Section 40—110, R. S. Kan., 1923, provides that the Commissioner of Insurance shall make a valuation "of all the outstanding policies, additions thereto, unpaid dividends and all other obligations of every life insurance company transacting business in this state."[1]

[1] These two sections were codified with other sections and re-enacted by chapter 231, Laws of 1927, section 40—409, R. S. Supp. Kan. 1930. Counsel for both sides used the original sections in their briefs, and we have followed suit.

Respondent deducted four per centum of the reserve funds set up against these coupons. The Commissioner disallowed the deduction; the Board of Tax Appeals reversed. The Commissioner appeals.

Since 1928 the Board of Tax Appeals has consistently held that the reserve set aside by life insurance companies against the liability on similar coupons is a "reserve" within the meaning of the Revenue Act of 1928 and the corresponding sections in the Revenue Acts of 1921, § 245 (a) (2), (42 Stat. 261) and 1924, § 245 (a) (2), 26 USCA § 1004 (a) (2). Standard Life Ins. Co. of America v. Com'r, 13 B. T. A. 13; Reserve Loan Life Insurance Company v. Com'r, 18 B. T. A. 359; Western Union Life Ins. Co. v. Com'r, 22 B. T. A. 1461, affirmed in (C. C. A.) 61 F.(2d) 207; Atlas Life Insurance Co. v. Commissioner, 29 B. T. A. ——. Two of these decisions have been affirmed by Circuit Courts of Appeal. Commissioner v. Standard Life Ins. Co. (C. C. A. 3) 47 F.(2d) 218; Commissioner v. Western Union Life Ins. Co. (C. C. A. 9) 61 F.(2d) 207. The Eighth Circuit Court of Appeals in Great Southern Life Ins. Co. v. Jones, 35 F.(2d) 122, held that similar coupons must be applied by the company to the purchase of extended insurance, the same as other reserve values of the policy. Williams v. Union Central Life Insurance Company, 54 S. Ct. 348, 352, 78 L. Ed. ——, said of this case:

"In Great Southern Life Insurance Co. v. Jones (C. C. A.) 35 F.(2d) 122, relating to a similar statute of Oklahoma, the policy provided for guaranteed 'premium reduction coupons' which were fixed liabilities requiring a reserve, and were not dividends in the proper sense as in the instant case."

Millar v. Western Union Life Ins. Co., 106 Wash. 490, 180 P. 488, held that such coupons were an integral part of the policy and not independent obligations. Our attention has been called to no case to the contrary.

■ This is a formidable array of authority. To it may be added that the revenue laws have been before Congress repeatedly since the first decision of the Board of Tax Appeals that a reserve against these coupons is a deductible item; the failure of Congress to amend the statute in this respect is strong evidence that the Board of Tax Appeals and the courts have divined correctly the intent of Congress.

We readily fall in step with this unbroken line of authority, for we are convinced that the decisions are right. We are in entire accord with petitioner's major premise that in its use of the word "reserve" Congress had in mind the technical meaning of the term as used in the business of insurance. We are also in accord with his contention that an insurance company is not entitled to deduct a reserve which it may have set up if it is not within this technical meaning, because a state authority so requires. A state may not amend the federal statutes. We disagree with the conclusion that these coupons do not constitute a liability for which reserves are required within the technical meaning of that term.

McCoach v. Insurance Company of North America, 244 U. S. 585, 37 S. Ct. 709, 61 L. Ed. 1333, dealt with fire insurance, which is quite a different business from that of life insurance. However, the definition of reserve funds therein contained is broad enough to include within its compass the reserve funds of life insurance companies. Reserve funds were there defined as "having reference to the funds ordinarily held as against the contingent liability on outstanding policies." Without undertaking a technical definition, the reserve funds of a life insurance company are designed to be sufficient to reinsure its outstanding risks at any time.

Death claims, rents, and taxes are liabilities of life insurance companies. They are not, however, contingent. Reserves against such liabilities are not within the term as used in this statute. These coupons constitute liabilities on outstanding policies; moreover, they are contingent upon the will of the insured. They are not payable at a fixed date, as is a death claim. They are payable "on or at any time after September 1, 1921." The policy provides different options, any one of which may be exercised by the insured, and under any one of which the company need not pay the insured in cash, but pays by the issuance of additional insurance or accelerating the maturity of other insurance. The liability is therefore contingent both as to time and method of payment, depending as it does, upon the will of the insured alone. Pacific States Life Ins. Co. v. Bryce (C. C. A. 10) 67 F.(2d) 710. Like the cash surrender value contained in the ordinary policy, a coupon may be withdrawn in cash, used to purchase insurance, or left to accumulate. Like the cash surrender value, the coupons represent a portion of the premium which has been paid by the policyholder, and which is not necessary to pay the expense of the policy or provide for the contingency of death.

The liability upon these coupons bears some resemblance to dividends on participating policies which may, at the option of the insured, be accumulated with the company and used for a variety of purposes. The Court of Claims has held that reserves set up against such dividends are not within the term as used by the Revenue Acts. Massachusetts Mut. Life Ins. Co. v. United States (Ct. Cl.) 56 F.(2d) 897. But the resemblance is a superficial one. These coupons, like the surrender values, fix an obligation upon the company the moment the policy is issued. Dividends grow out of a policy, but are not a part of its obligation. Chief Justice Hughes, in Williams v. Union Central Life Ins. Co., supra, doubtless drew upon the broad experience gained in the Armstrong investigation of life insurance practices, in delineating so clearly the difference between dividends and reserve values. Reserve values are the excess of the premiums paid, invested at a rate fixed by statute or contract, over the expense and the mortality charge according to the experience tables. The company can and does agree, at the outset, to return this excess to the policyholder by way of the reserve values which are written into the policy or attached to it by coupons. Dividends are the profits which arise when and if investments return more than the rate used in calculating the reserves, and when and if deaths are less frequent than the mortality tables predict. The company, when the close of a year has translated prophecy into experience, may set apart a portion of such profits, or savings, for distribution to policyholders, although if reasonably deemed necessary, it may be added to the surplus of the company as an anchor to windward in case of later storm. When a dividend is declared, the policyholder may take it, or, by a new agreement, leave it with the company. In the Williams Case, the Chief Justice refers to the coupons with which we are dealing, and classifies them as "fixed liabilities requiring a reserve." This is mathematically true, for the words of the coupons require a repayment to the policyholder, at stated intervals, of a portion of his premium, if he so elects.

The Supreme Court having classified these coupons with "reserve" liabilities, no more need be said. But if the question were balanced with doubt, the scales should be tipped by the practical urgency of protecting the savings of the multitudes invested in life insurance. The solvency of a life insurance

company depends upon the adequacy of its reserve funds. If those funds are sufficient in amount, and soundly invested, no policyholder can lose his savings as long as the institution of life insurance lasts, for there will be many companies ready and willing to reinsure its risks. But if no reserve is required against such liabilities as are incurred by these coupons, and if state laws permit such frills to be added to insurance contracts, no company will reinsure the risk; the policyholder's savings are then dependent upon the soundness of his company and not upon the soundness of the institution of life insurance. His risk is concentrated and not distributed, which is opposed to the whole scheme of insurance.

There is nothing in New York Life Ins. Co. v. Edwards, 271 U. S. 109, 46 S. Ct. 436, 70 L. Ed. 859, opposed to this conclusion. Under the 1913 law, the tax was based upon gross income, including premium receipts, an item dropped out in 1921 and succeeding acts. Under that law, it was held that deferred dividends on participating policies were not deductible from current income, since death or lapse would terminate the right thereto; the same conclusion was reached as to abatement of premium in case of disability. That case rests upon another proposition of tax law, that one may not make a deduction in anticipation of losses that may never occur.

The order of the Board of Tax Appeals is affirmed.

### On Petition for Rehearing.

The petition for rehearing assumes that the only liability of appellee on its matured but unsurrendered coupons is to pay the policy-holder the face thereof, with 3½ per cent. interest, on demand. If that were true, a much more difficult question would be presented.

But it is not true. We eliminate from consideration coupons which have been surrendered under option five for paid-up insurance, as the Commissioner concedes, apparently, that reserves must be carried against such additional insurance. We also eliminate coupons surrendered for cash or used to reduce premiums, for the liability is extinguished upon payment, and there is no suggestion that appellee has defaulted in this respect.

The coupons in question are those which have matured and have not been surrendered. The policyholder may withdraw them in cash, but he is not required to. He may use them at the end of 15, 20 or 31 years to purchase additional insurance or to accelerate the maturity of his policy. It is demonstrable that a 15-year-pay policy must carry a higher reserve, year by year, than a 20-year-pay policy. In the first, premiums need only be paid for 15 years to mature the policy; in the second, premiums must be paid for 20 years. The insured, by the use of his coupons, may at his own option, mature his policy in 15 years rather than 20; or mature it for 36.7 per cent more than its face value in 20 years; or mature it as an endowment in 31 years. Now either of such policies requires a higher reserve than the straight 20-year-pay policy to which the coupons are attached. If reserves are not set up against this option, the company will find itself, if the option is exercised, with a 15-year-pay policy outstanding and a reserve adequate only for a 20-year-pay. It is a technical policy reserve, without which no company could reinsure its outstanding risks with its reserves. Until the policyholder cashes the coupons, the contingency of its use to purchase additional insurance remains. When it is withdrawn in cash, the liability is extinguished; until that time, it is a contingent liability to the policyholder and a reserve must be set up against it.

The fact that the policyholder must be an insurable risk when the options are exercised does no more than introduce another contingency into the equation; it still remains true that matured coupons are liabilities to policyholders which are contingent upon the will of the policyholder if he is then insurable.

Except for a nominal surrender charge sometimes exacted the "cash surrender value" of a policy equals the reserve against that policy at the end of the policy year. A ten-year endowment requires a higher reserve, and has a higher cash surrender value, than an ordinary life policy. It is conceded that the technical reserve must equal the cash surrender value. Yet, like the coupons, the cash surrender value is a liability payable on demand; like the coupons, it may not be demanded; if not, reserves must be carried from year to year to meet it. If a policyholder does not draw down the cash surrender value, and ceases paying premiums, he has a paid-up policy or extended insurance. If a policyholder does not cash his coupons, and ceases paying premiums at the end of 15 or 20 or 31 years, he is entitled to a paid-up policy.

Both represent an excess of premiums paid over the cost of carrying the risk. The

rights flowing from them are not identical, but each may be taken down in cash or used to buy additional insurance, at the option of the policyholder. That one is in a table in the body of the policy, and the other in coupons attached thereto, makes no difference.

The petition for rehearing is denied.